IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 1, 2020

IN RE BRIANNA B. ET AL.

Appeal from the Chancery Court for Maury County
No. A-041-16        Stella L. Hargrove, Judge
_____

No. M2019-01757-COA-R3-PT
_____

In terminating a mother's parental rights, the trial court concluded that there were two statutory grounds for termination: abandonment by willful failure to visit and failure to manifest an ability and willingness to assume custody and financial responsibility. The trial court also concluded that termination of the mother's parental rights was in the child's best interest. Because we conclude that the evidence of the grounds for terminating the mother's parental rights was less than clear and convincing, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON II, J., joined.

Brandon E. White, Columbia, Tennessee, for the appellant, Debra H.

L. Samuel Patterson, Columbia, Tennessee, for the appellees, Michael B. and Jacqualin B.

**OPINION**

**I.**

This case is before us for the third time. Debra H. ("Mother") appeals the trial court's termination of her parental rights to her youngest child. The marriage of Mother and Michael B. ("Father") produced two children, Brianna and Elizabeth.[1] But Brianna

_____

[1] For the sake of consistency, we identify the children in the same manner as our previous opinions.

reached the age of majority before the second appeal. *In re Brianna B.*, No. M2019-00446-COA-R3-PT, 2019 WL 3992471, at *4 n.4 (Tenn. Ct. App. Aug. 23, 2019) (hereinafter "*Brianna II*").

In 2012, Mother and Father divorced, and under the permanent parenting plan, Father was named primary residential parent of the two children. Mother was granted visitation from Thursday afternoon to Sunday afternoon every other week. She was also granted visitation during certain holidays and when the children were on breaks from school. As part of the parenting plan, the parties agreed that Mother would not be required to pay child support.

Mother's visitation never went according to plan. She visited only occasionally and with little advance notice. So parenting Brianna and Elizabeth fell mostly to Father and Jacqualin B. ("Stepmother"), who Father married a few months after his divorce from Mother. Despite never following the visitation provisions of the parenting plan, neither Father nor Mother sought to modify the plan.

On October 21, 2016, Stepmother petitioned to terminate Mother's parental rights and to adopt Brianna and Elizabeth. *In re Brianna B.*, No. M2017-02436-COA-R3-PT, 2018 WL 6719851, at *1 (Tenn. Ct. App. Dec. 19, 2018) (hereinafter "*Brianna I*"). Father consented to Stepmother's efforts to adopt by joining in the petition. *See* Tenn. Code Ann. § 36-1-117(a), (f) (Supp. 2020). The petition to terminate alleged that Mother had abandoned Brianna and Elizabeth, both by Mother's willful failure to visit and her willful failure to support. The petition also alleged that Mother had abandoned the children by exhibiting a wanton disregard for their welfare. Finally, the petition alleged that Mother had failed to manifest an ability and willingness to personally assume legal and physical custody of the children.

Following a two-day trial, the trial court terminated Mother's parental rights. The court determined that there was not clear and convincing evidence to support terminating Mother's parental rights on the basis of abandonment by wanton disregard. But the court concluded that clear and convincing evidence supported the other alleged grounds for termination. The court found that Mother had visited with her children, including during the four-month period preceding the filing of the petition to terminate. Yet the court described "this [a]s a classic case of willful abandonment by token visitation." The court further found that Mother was aware of her duty to support her children, had a capacity to do so, made no attempt to do so, and had no justifiable excuse for not supporting her children. As for failure to manifest an ability and willingness to assume legal and physical custody, the court determined that Mother "never show[ed] any interest in assuming legal and physical custody of the[] children." The court also concluded that termination of Mother's parental rights was in the children's best interest.

Mother appealed, and we vacated the decision and remanded for additional findings of fact and conclusions of law on the grounds for termination. *Brianna I*, 2018 WL 6719851, at *7, *9. On the ground of abandonment by willful failure to visit, we asked the court to consider Mother's attempts to visit and a visit interrupted by Father "in assessing the willfulness of her failure to visit." *Id.* at *7. We also "note[d] that the Parties never adhered to the residential schedule and that the Petitioners' [sic] permitted visitation, when possible, with minimal notice from the time of the divorce in 2012." *Id.* So we reasoned that "[t]he Petitioners cannot now claim the inconvenience of Mother's lack of notice when attempting to terminate her parental rights based upon abandonment for failure to visit." *Id.* On abandonment by willful failure to support, we asked the court to address the agreement reflected in the parenting plan that Mother was not required to provide child support. *Id.* On the ground of failure to manifest an ability and willingness to personally assume legal and physical custody, among other concerns, the trial court's ruling lacked a finding "concerning whether placing the Children in Mother's care would pose a risk of substantial harm to their physical or psychological welfare." *Id.*

We also remanded for additional findings of fact and conclusions of law on the children's best interest "in light of the agreed upon parenting plan and the Children's ages at the time of the hearing." *Id.* at *9. The children evidenced different levels of attachment and feelings toward Mother, and the record reflected that Mother had "taken steps to improve her life and make room for the Children and evidenced her improvement by maintaining regular visitation with Elizabeth when permitted by the court." *Id.*

Following a second remand, *Brianna II*, 2019 WL 3992471, at *5, the trial court terminated Mother's parental rights to Elizabeth based on the original record. The court determined that the ground of abandonment by willful failure to support had not been proven. But the court concluded that clear and convincing evidence supported the grounds of abandonment by willful failure to visit and failure to manifest an ability and willingness to personally assume legal and physical custody. The court also concluded that termination of Mother's parental rights was in Elizabeth's best interest.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. State statute identifies those circumstances in which the government's interest in the welfare of a child justifies interference with a parent's constitutional rights. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2020).

3

Tennessee Code Annotated § 36-1-113 provides both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

In this appeal, Mother argues that neither ground for termination of her parental rights was proven by clear and convincing evidence. She also argues that the evidence did not clearly and convincingly establish that termination was in Elizabeth's best interest.

1. Abandonment by Willful Failure to Visit

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The parental termination statutes provide alternative definitions for "abandonment." *See id*. § 36-1-102(1)(A) (Supp.

4

2020). At the time the petition to terminate Mother's parental rights was filed, "abandonment" included "the willful failure to visit . . . the child during the four-month period preceding the filing of the petition to terminate parental rights."[2] *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i) (2017). Under this definition, the party seeking termination must prove, and the court must find, that the abandonment was willful. *In re Adoption of Angela E.*, 402 S.W.3d at 640. While the failure to visit or support presents a fact question, "whether a parent's failure to visit or support constitutes willful abandonment . . . is a question of law." *Id.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). A "[f]ailure to visit . . . a child is 'willful' when a person is aware of his or her duty to visit . . . , has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005).

In concluding that Mother abandoned Elizabeth by failure to visit, the trial court made the following pertinent findings:

> The four-month statutory period is June 21, 2016, to October 21, 2016.[3] [Mother's] visitation during the four-month period is not disputed. She did not visit at all in June and July of 2016. She visited one time in August, 2016, on August 7, 2016, for one hour. She visited on September 5, 2016, for two and one-half hours; on September 23, 2016, for fifteen minutes, and on September 25, 2016, for one hour and fifteen minutes. When [Mother] asked to see the children the first week of October, 2016, the children were already in Florida on a family vacation. She never asked to see the children the rest of October, 2016.

> [Father] testified he never prevented [Mother] from seeing the children during the four-month period. He testified she was simply not asking to see them. [Mother] denies this, and claims [Father] kept the children from her. The Court finds [Father] to be a credible witness; [Mother] is not.

In its original ruling, the court found that Mother's visits during the statutory period constituted only "token visitation."

---

[2] Effective July 1, 2018, petitioners no longer had to prove a parent's failure to visit was willful. 2018 Tenn. Pub. Acts 1088. Now, the parent or guardian whose rights are subject to termination may raise, and bears the burden of proof on, the defense of "absence of willfulness." Tenn. Code Ann. § 36-1-102(1)(I) (Supp. 2020).

[3] The four-month statutory period actually ran from June 21, 2016, through October 20, 2016, the day before the petition was filed. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

5

At the time Stepmother and Father filed their petition, "willfully failed to visit" meant "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." *See* Tenn. Code Ann. § 36-1-102(1)(E) (2017). Visitation is token if "the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(1)(C) (Supp. 2020). In determining whether Mother's visits were token, evidence of "the parent's conduct and the relationship between the child and the parent" outside of the four-month period provides "relevant background and context." *See In re Keri C.*, 384 S.W.3d 731, 749 (Tenn. Ct. App. 2010).

The trial court considered the relevant background and context and made several important factual findings. The court found that the parties never followed the visitation provisions of the permanent parenting plan and that Mother's "visitation with the children ha[d] always been sporadic." The court also found that Mother would give short notice of her desire to see the children. The record further shows that the original parenting schedule had become unworkable, both because of Mother's and Brianna's work schedules and the children's schooling. Father testified that, outside of the four-month period, he would shorten Mother's visitation time on school nights so that the girls would be home by 7:00 p.m. to eat and bathe. And he testified that he refused to drop the girls off at Mother's house at 8:00 p.m. because Mother was working and would not return home until 2:00 a.m. when she got off of work.

Under the circumstances of this case, Mother's visitation during the four-month period preceding the filing of the petition to terminate parental rights was not token visitation. Although Mother only visited for a total of five hours, we note, again, that one of Mother's visits was unexpectedly cut short by Father. *Brianna I*, 2018 WL 6719851, at *7. And Mother made two other attempts to visit during the statutory period that were declined by Father, although for understandable reasons. *Id.* Also, the statutory period fell at least partially during the school year, a period during which Father restricted the time the children could visit. Given the relevant background and context, the visitation that did occur was more than perfunctory, and it was not so infrequent or of such short duration as to be minimal or insubstantial contact, particularly with respect to Elizabeth.

We also note that in person visits were not the only contact between Mother and her children. Telephone calls and text messages "during the pivotal four-month period do[] not constitute 'visitation,' either token or otherwise, and do[] not preclude a finding that [a parent's] failure to visit the child was willful." *In re Adoption of Marissa O.R.*, No. W2013-01733-COA-R3-PT, 2014 WL 2475574, at *15 (Tenn. Ct. App. May 30, 2014) (citing *In re Amelia M.*, No. E2012-02022-COA-R3-PT, 2013 WL 4715043, at *9 (Tenn. Ct. App. Aug. 30, 2013)). But such communications are relevant to the issue of willfulness. *Id.* Here, the trial court found that Mother and Father, Stepmother, Brianna,

6

and/or Elizabeth communicated with one another during the four-month period by telephone over 55 times. And there were "a total of 8 sets of texts, with 5 instigated by [Mother] and 3 by [Elizabeth] or [Stepmother and Father]."

We conclude that Stepmother and Father failed to prove by clear and convincing evidence that Mother abandoned Elizabeth by willful failure to visit. So we examine the only other ground relied on for terminating Mother's parental rights.

2. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility

The trial court found termination of parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if she

> [1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Both the first and second prongs must be established by clear and convincing evidence. *In re Neveah M.*, __ S.W.3d __, No. M2019-00313-SC-R11-PT, 2020 WL 7258044, at *11 (Tenn. Dec. 10, 2020).

In *Brianna I*, we vacated and remanded, in part, because the trial court failed to make factual findings and conclusions of law relative to the second prong. 2018 WL 6719851, at *7. Following the remand, the court determined that there was a risk of substantial harm to Elizabeth's psychological welfare. Specifically,

> Elizabeth told the Court she wants to see her mother every other weekend. However, when asked about staying with her overnight she was hesitant. Then she stated: "Not every other weekend – just sometimes."

> [Mother] places the obligation on the children to call her. [Father] testified that either he, [Stepmother], or the children always return her calls. The Court believes this, and feels the original order terminating [Mother's] rights is indicative of this. Also, both Brianna and Elizabeth testified [Mother] failed to return their calls at times.

> Brianna testified that she and her mother are "not really close . . . she left us for around three years, and she would not invite me to family things. Drugs, alcohol and bars were more important than family . . . I've been to

7

her house one time . . . it was awful, a putrid smell . . . bugs everywhere . . . I was gagging . . . very nasty . . . disgusting." Brianna recalled an overnight visit stating: "We slept in the backseat of my car. Mom and [Mother's fiancé] slept in a tent . . . I did want to go at first until [Mother's fiancé] came home and her attention is more toward him." "Mother's Day in 2015 was the first time we stayed overnight in years." "Every time she called she needed something . . . [Elizabeth] is better and closer than me . . . I see why . . . she was younger at divorce . . . [Elizabeth] does not remember her not calling when she left . . . I remember all the things she did to me." Elizabeth was only eleven years old at trial.

> The record reflects that [Mother] was on her cell phone a majority of the brief times she was with her children. An example is August 7, 2016, during Elizabeth's birthday party. The Court is not convinced that [Mother] will prioritize her children over [her fiancé], as well as her drugs and alcohol. She has a lifestyle that includes the children at her convenience. The Court finds this is psychologically damaging to Elizabeth's welfare.

We conclude that the evidence of the risk of substantial harm is less than clear and convincing. Although "a risk of substantial harm" is "not amenable to precise definition,"

> the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted). By way of illustration, forcing a child to begin visitation with a near-stranger would make psychological harm sufficiently probable. *See In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (holding that substantial harm could be established when a child was removed from a home when very young and had nightmares out of fear of being removed from his foster family); *State v. C.H.H.*, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *9 (Tenn. Ct. App. May 21, 2002) (holding that removal from the child's current family and placement with a near-stranger could constitute substantial harm). Or placing a child with a parent who engaged in repeated criminal conduct that required incarceration would put a child at risk of substantial physical or psychological harm. *In re O.M.*, No. E2018-01463-COA-R3-PT, 2019 WL 1872511, at *4 (Tenn. Ct. App. Apr. 26, 2019) (quoting *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *15 (Tenn. Ct. App. June 20, 2018)). And parents with a significant, recent history of substance abuse, mental illness, and/or

domestic violence could lead to a conclusion of a risk of substantial harm. *In re Brantley O.*, No. M2019-01265-COA-R3-PT, 2020 WL 6253562, at \*6 (Tenn. Ct. App. Oct. 22, 2020) (holding that the mother's continued struggle with drug addiction and her relationship with a registered sex offender presented a risk of substantial harm); *In re Piper B.*, No. M2017-00930-COA-R3-PT, 2018 WL 3954328, at \*10 (Tenn. Ct. App. Aug. 17, 2018) (holding that the mother's failure to address her history of drug addiction, mental illness, and domestic abuse "create[d] a substantial hazard or risk of danger to the children's welfare that [wa]s not minor, trivial, or insignificant"); *In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at \*18 (Tenn. Ct. App. May 8, 2018) (holding that the mother's failure to cut ties with the father who had a history of domestic violence led to a risk that was not "minor, trivial, or insignificant"). Even with the additional findings made by the trial court, we do not find an analogous situation here.

As noted above, in *Brianna I*, we commented that the record reflected that Mother had "taken steps to improve her life and make room for the Children and evidenced her improvement by maintaining regular visitation with Elizabeth when permitted by the court." 2018 WL 6719851, at \*9. The deplorable living conditions described by Brianna in the testimony cited by the court referred to the home of the grandfather of Mother's fiancé. Mother lived there while she was caring for her fiancé's mother and grandfather. Without dispute, the home was dirty, smelled bad, and was bug infested. The conditions were attributed to the serious medical conditions of both fiancé's mother and grandfather, which necessitated around-the-clock care. Mother and her fiancé planned to take up residence in a mobile home on land that her fiancé had purchased. Both Mother and her fiancé testified to the new living arrangement and pictures of the new home were introduced.

Mother did admit to the use of methamphetamine and marijuana in 2013 and 2014. Mother's fiancé was convicted for manufacturing, possession with intent to sell, and promotion for methamphetamine and was in custody from the end of 2014 until March 2017. He had completed a drug treatment program and was being drug tested "at least twice a month." He testified that Mother's prior drug use was not like his and that she was the one that "stayed on [him] for using it." In written discovery, Mother had also admitted to a single use of marijuana in the spring of the year. Although Mother and her fiancé both offered to submit to drug screens, that offer was not accepted.

Rather than home life or the risk of future drug use, the trial court focused more on Mother's sporadic visitation as posing a substantial risk of being psychologically damaging to Elizabeth. But, other than Father testifying to the children's disappointment with Mother over missing visits and their school sporting events, Stepmother and Father presented no evidence of psychological damage or the risk of psychological harm to Elizabeth. Even though it does not preclude the possibility that there could be some harm, the record reflected, and the trial court found, that Elizabeth wanted to continue her visitation with Mother.

Although the concerns raised by Stepmother and Father might be an appropriate basis to condition or limit Mother's visitation, they failed to prove that there was more than a theoretical possibility of substantial psychological harm from continuing the parent-child relationship between Mother and Elizabeth. Because establishing a risk of substantial harm to the physical or psychological welfare of the child is a necessary element of the ground, we conclude that Stepmother and Father failed to prove the statutory ground of failure to manifest an ability and willingness to assume custody or financial responsibility.

B.

As Stepmother and Father failed to prove by clear and convincing evidence a statutory ground for termination of Mother's parental rights, we do not reach the issue of the child's best interest. *See In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (requiring that the party seeking to terminate parental rights prove by clear and convincing evidence both a ground for termination and that termination is in the child's best interest).

**III.**

The record does not contain clear and convincing evidence to support terminating Mother's parental rights on either of the two grounds relied on by the trial court. So we reverse the termination of Mother's parental rights.

_____
W. NEAL MCBRAYER, JUDGE